[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13142

_____

ERIC C. YOUNGBLOOD, SR.,
MELISSA D. YOUNGBLOOD,

Plaintiffs-Appellants,

*versus*

CITY OF GEORGIANA, ALABAMA,
an Alabama Municipal Corporation,
WILLIE R. BENBOW,
CARLTON COOK,
in their individual capacities,
RICKY STALLWORTH,
JEREMY PEAGLER,
in his individual capacity,
BEVERLY H. ROGERS,
in her individual capacity,

Defendants-Appellees,

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:19-cv-01072-ECM-JTA

_____

Before NEWSOM, BRASHER, and WILSON, Circuit Judges.

BRASHER, Circuit Judge:

After an officer arrested Eric Youngblood on an arrest warrant for harassment, Youngblood filed a *pro se* action against several officials alleging, among other things, false arrest, false imprisonment, and malicious prosecution under the Fourth Amendment. He sued the clerk who issued the arrest warrant. He sued both the officer who arrested him and that officer's supervisors. His wife filed a loss-of-consortium claim too.

The Youngbloods' claims all fall short. The clerk had probable cause to issue Youngblood's arrest warrant. The arresting officer is protected by qualified immunity because he arrested Youngblood with probable cause. And because that officer committed no constitutional violation, Youngblood's supervisory-liability claim against the officer's supervisors also fails. So, his wife's loss-of-consortium claim—which derives from his claims—fails as well. We affirm.

## I.

### A.

Eric Youngblood was hired for a property-maintenance job by Woodglen Apartments in Georgiana, Alabama. On November 15, 2018, Youngblood arrived at Woodglen to deliver employment paperwork to Woodglen's manager, Tonya Castleberry.

As Youngblood was preparing to leave Castleberry's office, Ricky Stallworth, one of Woodglen's residents, entered. According to Castleberry, Youngblood said "Hey" to Stallworth, who then "[s]tarted [p]unching Eric Youngblood in the face and yelling at him 'You['re] not so bad now without your gun'" and "'[n]ext time you pull a gun you will think.'" Castleberry called Assistant Chief of Police Jeremy Peagler, and Officer Willie Benbow was dispatched to the scene. Youngblood held Stallworth until Officer Benbow arrived.

Upon arriving, Officer Benbow asked what happened. Stallworth exclaimed that Youngblood "pulled a gun" on him earlier and that Youngblood had legal issues with Stallworth's brother; Youngblood said he was there for a job appointment. Stallworth further exclaimed that Youngblood still had a handgun, and asked the officer to check Youngblood's car, "guarantee[ing]" there was a gun inside. Youngblood gave Officer Benbow permission to search the car. Video footage reveals that the officer then briefly peered into the car. He did not see a gun.

Officer Benbow concluded that Stallworth was the aggressor in the altercation and arrested him for assault. In the course of the arrest, Stallworth said Youngblood had been "terroriz[ing]" people by using guns. Officer Benbow responded that Stallworth could "sign a warrant" on Youngblood later. The next day, Officer Benbow appeared before Beverly Rogers, a city clerk who was also a magistrate, to complete a criminal complaint against Stallworth for assault.

Youngblood, in turn, went to Georgiana's city hall after the altercation to complete an incident report. His complaint in this case alleged that he sought to sign a criminal complaint against Stallworth, but Rogers did not allow it and, instead, signed an arrest warrant herself. According to Youngblood, Rogers was "combative," accused him of threatening her, and stated that he was "'irritating everyone talking about suing and stuff like that.'"

Sometime after the altercation, Stallworth also appeared before Rogers to swear out a warrant on Youngblood for harassment. In a formal affidavit, Stallworth attested to the following in support of an arrest warrant for Youngblood:

> This incident occurred at Woodglen apartments in [G]eorgiana. [O]n November 15, 2018 at 6:30 a.m. I came out of my apartment for my daily walk[.] I seen Eric Youngblood riding through the parking lot. He made eye contact with me and then reach down to his side and pulled out a revolver hand gun and brandish at me. I immediately retreated back into my apartment. I walked over to apartment manager office[.] I

walked in[.] Eric was on his way out office. As he passed me he said Mother Fucker I'm still going to kill you. At that time him and I got into a altercation. Eric has made threats about killing me in the past. I also noticed when [I] was at clerk office he rode by following me and I pointed it to the clerk. I just want the harassment and the following to stop.

Based on Stallworth's sworn testimony, Rogers issued a warrant for Youngblood's arrest.

After Youngblood learned about that warrant, he had a phone call with Chief of Police Carlton Cook, who encouraged Youngblood to turn himself in to avoid being arrested. So on December 21, 2018, Youngblood went to the police department to surrender himself, and Officer Benbow arrested Youngblood pursuant to the warrant that Rogers had issued. Youngblood posted a property bond and was released from custody that day.

In January 2019, Stallworth's complaint against Youngblood for harassment was brought before a municipal court. The City of Georgiana moved to dismiss the charges, however, and the municipal court granted that motion on the condition that Youngblood and Stallworth "avoid contact with each other, directly or indirectly." In December 2019, the municipal court fully granted the City's dismissal motion, and all charges against Youngblood were formally dropped.

*B.*

Youngblood filed a *pro se* action in federal district court, suing the City of Georgiana, Rogers, Officer Benbow, Officer Cook, and Stallworth. He amended his complaint to add his wife Melissa Youngblood ("Melissa") as a plaintiff and Officer Peagler as a defendant. The district court ordered Youngblood to prepare a second amended complaint.

In the operative second amended complaint, the Youngbloods alleged fifteen counts, all against the defendants in their individual capacities. Relevant here, Youngblood sued Rogers, under 42 U.S.C. § 1983, for retaliation in violation of the First Amendment (count 1) and malicious prosecution and false arrest in violation of the Fourth Amendment (counts 2 and 3). He sued Officer Benbow under section 1983 for false arrest (count 4) and false imprisonment (count 5) in violation of the Fourth and Fourteenth Amendments, and under Alabama state law for malicious prosecution (count 11). He sued Officers Cook and Peagler under section 1983 for unlawful seizure in violation of the Fourth Amendment using a theory of supervisory liability (count 7). Melissa sued all the defendants for loss of consortium (count 15).

Rogers moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that she was entitled to absolute immunity because she acted in her judicial capacity when issuing Youngblood's arrest warrant. The district court granted Rogers's motion, concluding that she was entitled to absolute immunity.

The parties proceeded to discovery, after which Officers Benbow, Peagler, and Cook moved for summary judgment. The Youngbloods responded that Eric Youngblood's "malicious prosecution, false arrest, and false imprisonment claims against the individual Defendants must survive" and that the court was to "deny the motion for summary judgment on the above claims."

The district court granted summary judgment for the defendants. First, the court concluded that Officer Benbow was entitled to qualified immunity on the false arrest and false imprisonment claims (counts 4 and 5) because he was performing a discretionary function and had probable cause to arrest Youngblood based on the arrest warrant. The court also concluded that Youngblood had abandoned his state-law malicious prosecution claim against Officer Benbow (count 11) because Youngblood failed to provide support for it in his response to the officer's motion for summary judgment. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (explaining that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned"). Second, the court concluded that Youngblood had abandoned his supervisory-liability claim against Officers Cook and Peagler (count 7) because he failed to address that claim in his summary judgment response. *See id.* Third, the court concluded that Melissa abandoned her loss-of-consortium claim because she did not address it at summary judgment. The court then entered final judgment, and the Youngbloods timely appealed.

## II.

We review *de novo* a motion to dismiss for failure to state a claim, accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff. *Sibley v. Lando*, 437 F.3d 1067, 1070 (11th Cir. 2005) (per curiam). We review *de novo* a district court's grant of summary judgment, viewing the evidence and all reasonable inferences in the light most favorable to the non-moving party. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018). Summary judgment is proper "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)).

## III.

Youngblood makes several arguments. First, he argues that Rogers was not absolutely immune from suit. Second, he argues that Officer Benbow lacked qualified immunity from Youngblood's false arrest, false imprisonment, and state-law malicious prosecution claims because the officer lacked arguable probable cause to arrest him. Third, he argues that Officers Cook and Peagler are liable under supervisory liability for Officer Benbow's unlawful seizure in violation of the Fourth Amendment. Lastly, Melissa argues that the court erred in dismissing her loss-of-consortium claim. Each challenge fails.

*A.*

We begin with Youngblood's argument that Rogers lacked absolute immunity. Youngblood alleged that Rogers, by issuing an arrest warrant against him, engaged in First Amendment retaliation and Fourth Amendment malicious prosecution and false arrest. The district court dismissed those claims, reasoning that Rogers was entitled to absolute immunity because she was performing acts in her judicial capacity. Youngblood contends on appeal that the court erred in granting Rogers absolute immunity.

Assuming Youngblood preserved his challenge against Rogers's assertion of absolute immunity, we uphold the district court's dismissal of his claims against Rogers—but on the basis that Rogers had probable cause to issue the arrest warrant. Even though the district court did not dismiss Youngblood's claims against Rogers on probable-cause grounds, we "may affirm the district court's judgment on any ground supported by the record." *Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 857 (11th Cir. 2023). And here, even if Rogers lacked absolute immunity, Youngblood's claims fail because Rogers had probable cause to issue an arrest warrant.

Indeed, Youngblood's claims against Rogers all require a pleading of no probable cause. To plead First Amendment retaliation, Youngblood must plead "an absence of probable cause as to the challenged retaliatory arrest or prosecution in order to establish the causation link between [Rogers's] retaliatory animus and [Youngblood's] injury." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019); *see Nieves v. Bartlett*, 587 U.S. 391, 405

(2019) ("The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim."). And although an exception to the no-probable-cause requirement exists when government officials have probable cause to make arrests but typically exercise their discretion *not* to do so, *see DeMartini*, 942 F.3d at 1296–97, nothing suggests that the exception applies here. Likewise, to plead malicious prosecution and false arrest under the Fourth Amendment, a plaintiff must plead a lack of probable cause. *See Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010) ("[T]he existence of probable cause defeats a § 1983 malicious prosecution claim."); *Crocker v. Beatty*, 995 F.3d 1232, 1243 (11th Cir. 2021) ("The existence of probable cause bars a Fourth Amendment false-arrest claim.").

The record makes clear that Rogers had probable cause to issue Youngblood's arrest warrant for harassment. "Probable cause exists when a reasonable officer could conclude . . . that there [is] a substantial chance of criminal activity." *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022) (quotation marks omitted). And here, Rogers could reasonably conclude, based on Stallworth's affidavit, that Youngblood had engaged in harassment.

Under Alabama law, a person commits harassment if he, "with intent to harass, annoy, or alarm another person," issues "a threat, verbal or nonverbal, made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety." Ala. Code §§ 13A-11-8(a)(1), (2). Here, Stallworth's affidavit conveyed that there was a

"substantial chance" that Youngblood had intentionally threatened Stallworth in a way that would cause a reasonable person to fear for his safety. *See id.*; *Badia*, 47 F.4th at 1180 (quotation marks omitted). Stallworth stated in the affidavit that on "November 15, 2018 at 6:30 a.m.," he saw Youngblood ride "through the parking lot" in his apartment complex and brandish a revolver handgun at him; that Youngblood later said to him at the manager's office "I'm still going to kill you"; that Youngblood had made threats about killing Stallworth in the past; and that Youngblood followed Stallworth when he was at the clerk's office. From these details, Rogers had probable cause to conclude that Youngblood had engaged in harassment in violation of Alabama law.

Thus, Youngblood's claims that Rogers violated his First and Fourth Amendment rights by issuing an arrest warrant, all fail.

### B.

So do his claims against Officer Benbow for false arrest, false imprisonment, and state-law malicious prosecution.

We start with Youngblood's false arrest and false imprisonment claims. The district court held that Officer Benbow was protected from those claims by qualified immunity. In qualified immunity analysis, the defendant officer must establish that he was acting within his discretionary authority; if he does, the plaintiff must establish that (1) the officer violated a constitutional right that (2) was clearly established at the time of the violation. *Patel v. Lanier County*, 969 F.3d 1173, 1181 (11th Cir. 2020). The parties do not dispute, and the district court concluded, that Officer Benbow acted

within his discretionary authority. The issue is whether Officer Benbow violated Youngblood's clearly established rights.

As an initial matter, we treat the "right" underlying Youngblood's false arrest and false imprisonment claims as the right against unreasonable seizures under the Fourth Amendment. *See generally Ortega v. Christian*, 85 F.3d 1521, 1525–26 (11th Cir. 1996) (rooting false arrest and false imprisonment claims in the Fourth Amendment). Although Youngblood's second amended complaint labeled his false imprisonment claim as a Fourteenth Amendment claim, the district court treated it as a Fourth Amendment claim, and Youngblood asks us on appeal to treat that claim as a Fourth Amendment one too. So, the question is whether Officer Benbow violated Youngblood's clearly established Fourth Amendment right against unreasonable seizure.

That question resolves in the officer's favor. For Youngblood to succeed on his false arrest and false imprisonment claims, he must establish that Officer Benbow lacked probable cause to arrest him. *See Crocker*, 995 F.3d at 1243; *Ortega*, 85 F.3d at 1526; *Case v. Eslinger*, 555 F.3d 1317, 1330 (11th Cir. 2009) (existence of probable cause defeated false imprisonment claim). And even if we, as Youngblood requests, construe his false arrest and false imprisonment claims as a Fourth Amendment malicious prosecution claim, such a claim would also require Youngblood to establish that Officer Benbow lacked probable cause. *See Grider*, 618 F.3d at 1256. Further, to win on qualified immunity's clearly-established-law prong, Youngblood must do even more: he must establish that

Officer Benbow did not have even *arguable* probable cause to arrest him—in other words, that no reasonable officer in Officer Benbow's circumstances *could* have believed there was probable cause to arrest him. *See Edger v. McCabe*, 84 F.4th 1230, 1236 (11th Cir. 2023).

Youngblood has not satisfied that burden: Officer Benbow had probable cause to arrest him. To start, the officer arrested him pursuant to an arrest warrant—and the bar to establish a lack of probable cause "only rises higher" when an arrestee is "arrested under the authority of a warrant." *Turner v. Williams*, 65 F.4th 564, 582 (11th Cir. 2023). More specifically, Stallworth's affidavit, which undergirded the warrant, provided probable cause—and certainly arguable probable cause—to arrest Youngblood for Alabama-law harassment. Again, a person commits such harassment if he, with intent to harass a person, threatens the person in a way that would cause him to reasonably fear for his safety. *See* Ala. Code §§ 13A-11-8(a)(1), (2). And here, as discussed above, Stallworth's affidavit detailed how Youngblood made multiple verbal threats to kill Stallworth, followed him, and brandished a gun. Officer Benbow reasonably concluded from the warrant that there was a "substantial chance" that Youngblood had intentionally threatened Stallworth so as to cause him to reasonably fear for his safety. *See Badia*, 47 F.4th at 1180 (quotation marks omitted).

Youngblood's counterarguments fall short. He points to our caselaw stating that a probable cause determination cannot "stand principally on the unsupported statements of interested" witnesses,

"when those statements have been challenged and countered by objective evidence." *Kingsland v. City of Miami*, 382 F.3d 1220, 1228 (11th Cir. 2004). And here, he says, Stallworth's affidavit was not credible because (1) it was not specific enough; (2) when Officer Benbow initially arrived at the scene, Stallworth said Youngblood had a gun in his car and it turned out he did not; and (3) Officer Benbow initially determined Stallworth to be the aggressor and placed Stallworth under arrest.

None of these facts demonstrates that Officer Benbow lacked probable cause to arrest Youngblood. First, the affidavit was specific. It mentioned *when* Youngblood threatened Stallworth (around 6:30 a.m. on November 15, 2018), *where* (at the apartment complex parking lot and the manager's office), and *how* (Youngblood brandished a gun and said he would kill Stallworth).

Second, that Officer Benbow did not immediately find a gun in Youngblood's car after Stallworth said a gun was inside, does not mean the officer could not reasonably rely on the arrest warrant based on Stallworth's affidavit. For one, Stallworth's exclamation about a gun being in the car, did not mean he could not be trusted later in his sworn affidavit. And, Youngblood could have easily removed a gun from his car in between his brandishing of the gun at around 6:30 a.m. and when he let Officer Benbow search the car. Plus, video footage revealed that Officer Benbow only peeked into Youngblood's car—without, for instance, flipping through things inside or looking inside the car's cabins or underneath its seats.

Third, that Officer Benbow determined Stallworth to be the aggressor at first, does not mean it was unreasonable for the officer to conclude that there was probable cause that Youngblood harassed Stallworth before or after their confrontation in the lobby. By the time the officer executed the arrest warrant, Stallworth's affidavit provided details about Youngblood's alleged conduct that the officer either did not hear when he initially arrested Stallworth, or did hear but were not in a sworn statement. Because Youngblood has not established that Officer Benbow lacked probable cause to arrest him, his Fourth Amendment claims against the officer fail.

Likewise, his Alabama-law malicious prosecution claim, even if it had not been abandoned, also fails. Malicious prosecution under Alabama law requires a plaintiff prove, among other things, that the defendant initiated a judicial proceeding "without probable cause." *Ex parte Harris*, 216 So. 3d 1201, 1214 (Ala. 2016) (quotation marks omitted). In the Alabama-law malicious-prosecution context, probable cause is a "reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged." *See Moon v. Pillion*, 2 So. 3d 842, 846 (Ala. 2008) (quotation marks omitted). Here, even if we assume that Officer Benbow initiated a proceeding by executing a warrant to arrest Youngblood, the officer had probable cause to do so. For the reasons discussed above, the officer clearly had a reasonable ground for suspicion that Youngblood had engaged in harassment.

### C.

We turn to Youngblood's Fourth Amendment supervisor-liability claim against Officers Cook and Peagler. A supervisor is liable under section 1983 "either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Christmas v. Harris County*, 51 F.4th 1348, 1355 (11th Cir. 2022) (quotation marks omitted). Here, Youngblood argues that Officers Cook and Peagler should be liable as supervisors for Officer Benbow's unlawful seizure under the Fourth Amendment, because Officers Cook and Peagler knew that Officer Benbow was "poised to execute an unlawful warrant" yet failed to intervene.

We disagree. Indeed, Youngblood does not argue that Officers Cook and Peagler personally participated in Youngblood's arrest, so he must instead establish a sufficient causal connection between the supervisors' actions and Officer Benbow's alleged deprivation of Youngblood's rights. *See Christmas*, 51 F.4th at 1355. But because, as explained above, Officer Benbow had probable cause to arrest Youngblood, he committed no unlawful activity in the first place: there was no constitutional deprivation against which Officers Cook and Peagler failed to intervene—let alone any deprivation they helped cause. Youngblood's supervisory-liability claim fails.

### D.

Lastly, we turn to Melissa's loss-of-consortium claim, which is entirely derivative of Youngblood's claims. *See Lyons v. Vaughan Reg'l Med. Ctr., LLC*, 23 So. 3d 23, 29 (Ala. 2009). Because all of Youngblood's claims fail, her claim—even if we assume it was not abandoned—fails too.

### IV.

We **AFFIRM** the district court.